IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

Case No. _____

CHRISTOPHER MCWILLIAMS,

     Plaintiff,

vs.

ECN (US) HOLDINGS CORP.,
ECN CAPITAL CORP.,
STEVEN K. HUDSON, and
MICHAEL MCCORMACK,

     Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiff, Christopher McWilliams ("Plaintiff"), sues Defendants, ECN (US) Holdings Corp. ("ECN Holdings"), ECN Capital Corp. ("ECN Capital") (ECN Holdings and ECN Capital are collectively referred to as "ECN"), Steven K. Hudson ("Mr. Hudson"), and Michael McCormack ("Mr. McCormack") (ECN, Mr. Hudson, and Mr. McCormack are together referred to as "Defendants"), and alleges as follows:

1.     Plaintiff has initiated the instant action to redress violations by Defendants of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"). Plaintiff asserts that Defendants failed to pay Plaintiff proper overtime compensation and terminated his employment in retaliation for complaining about not being properly compensated for his work, in violation of the FLSA.

2.     In addition, Plaintiff brings this action for breach of contract because of ECN's failure to pay: all owed wages, accrued but unused paid time off, granted performance share units that would have vested had Plaintiff not been unlawfully terminated, and an annual bonus.

3.      Plaintiff seeks all damages provided for under the FLSA, including attorneys' fees and costs, as well as all damages for his additional claims.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff is an individual over the age of 18 and is otherwise *sui juris*.

5.      During the relevant period, Plaintiff was a resident of St. Lucie County, Florida.

6.      ECN Holdings is a business entity which, during the relevant period, was a Foreign Profit Corporation with its principal place of business in Palm Beach County, Florida.

7.      ECN Capital is ECN Holdings' parent company which does business in Palm Beach County, Florida.

8.      During the relevant period, Mr. Hudson was the Chief Executive Officer of ECN who, upon information and belief, resided in Palm Beach County, Florida.

9.      During the relevant period, Mr. McCormack was the Chief Risk Officer of ECN who, upon information and belief, resided in Palm Beach County, Florida.

10.     During the relevant period, ECN acted through its owners, officers, agents, servants, and employees, all of whom acted within the scope of their employment with Defendants.

11.     During the relevant period, Defendants were the employer, joint employer, or co-employer for purposes of the FLSA as the term employer is defined by 29 U.S.C. § 203, for Plaintiff.

12.     During the relevant period, ECN operated, conducted, engaged in, or carried on through its agents and apparent agents a business venture in Florida, or had an office or agency in Florida.

13.     This is an action by Plaintiff for damages exceeding $30,000, excluding attorneys' fees or costs.

14.     This Court has jurisdiction over Plaintiff's claims as events leading to the filing of this Complaint took place in Palm Beach County, Florida.

15.     Venue is proper in Palm Beach County because the actions which form the basis of this Complaint occurred within Palm Beach County, Florida.

16.     During the relevant period, ECN was an enterprise that engaged in interstate commerce and had annual gross revenue in excess of $500,000.

17.     During the relevant period, ECN employed two or more individuals that customarily and regularly sold and/or marketed and/or distributed their services and/or goods and/or services to customers throughout the United States and also provided its services across state lines.

18.     During the relevant period, ECN obtained and solicited funds from non-Florida sources, accepted funds from non-Florida sources, used telephonic transmissions going over state lines to do business, transmitted funds outside the state of Florida, and otherwise regularly engaged in interstate commerce.

19.     During the relevant period, ECN accepted checks, wire transfers, and/or other forms of payments that were made or processed outside the state of Florida.

20.     During the relevant period, Defendants were "employers" pursuant to the FLSA.

21.     During the relevant period, ECN was an enterprise engaged in commerce as defined in 29 U.S.C. §§ 203(r) and 203(s).

22.     During the relevant period, Plaintiff was an "employee" pursuant to 29 U.S.C. § 203(e)(1) of the FLSA, and was an employee of Defendants.

23.     During the relevant period, Defendants failed to comply with 29 U.S.C. §§ 201-219 in that Plaintiff was not paid overtime wages at the rate of time and one-half for all hours worked

3

in excess of 40 hours in each workweek.

24.     Claims under the FLSA do not have prerequisites or preconditions to filing a lawsuit and therefore, Plaintiff has met all prerequisites and preconditions to filing this lawsuit.

## FACTUAL ALLEGATIONS

25.     Plaintiff began working at ECN on or about January 10, 2022 and entered into an Employment Agreement with ECN. *See* **Exhibit 1**. Plaintiff was unlawfully terminated on or about October 6, 2022.

26.     Plaintiff was hired by ECN as a Secured Driver to ECN's Chief Executive Officer, Mr. Hudson.

27.     Plaintiff reported to, and was regularly overseen by, Mr. Hudson and Mr. McCormack.

28.     Plaintiff's Employment Agreement indicated that Plaintiff was required to perform tasks "assigned by the Chief Risk Officer [Mr. McCormack] and/or the Chief Executive Officer [Mr. Hudson]." *See* Ex. 1 ¶ 1.

29.     Furthermore, Plaintiff's Employment Agreement provided that "[t]he Chief Risk Officer and/or the Chief Executive Officer shall conduct an annual review of the Employee's performance." *Id.* ¶ 2(g).

30.     Plaintiff was paid a base salary of $92,500/year.

31.     Throughout Plaintiff's employment at ECN, Plaintiff regularly worked in excess of 40 hours in a workweek but did not receive time and one half of his regular rate for these overtime hours.

32.     Plaintiff did not have a set schedule, frequently worked nights and weekends, and was regularly on call.

33.     Plaintiff was specifically told by Mr. Hudson and Mr. McCormack that he was expected to make himself available and to address Mr. Hudson's requests at all times.

34.     As a result, Plaintiff was on call 24 hours a day, including weekends.

35.     Defendants had knowledge of Plaintiff's overtime hours and non-exempt employment duties, but purposefully failed to provide him overtime pay in violation of the FLSA.

36.     Defendants required Plaintiff to, among other things, drive Mr. Hudson, his family, friends, and acquaintances to any requested location, at any time, for business and personal purposes.

37.     Additionally, when Mr. Hudson was out of town, Defendants required Plaintiff to assist full-time in the office with clerical functions such as picking up lunch and coffee at Starbucks and doing errands for the office,.

38.     Also, Plaintiff's supervisor, Mr. Hudson, required Plaintiff to perform personal tasks for him and his family, such as assisting with Mr. Hudson's personal residential move and accompanying Mr. Hudson's mother to doctors' appointments.

39.     While Defendants classified Plaintiff as an exempt employee under the FLSA, Plaintiff performed primarily, if not exclusively, non-exempt work under the close supervision of Defendants.

40.     Plaintiff's job duties included primarily, if not exclusively, driving Mr. Hudson for business and personal matters (such as going out on dates), as well as his family members, and clerical work for ECN.

41.     Plaintiff did not exercise independent judgment and discretion on matters of significance.

42.     Plaintiff's primary duties were not management or administrative, and Plaintiff did

not customarily and regularly perform exempt duties under the FLSA.

43.     Plaintiff did not have any authority to set and adjust the rates of pay and hours of work for any employee.

44.     Plaintiff did not have the ability to hire or fire anyone (nor did Plaintiff hire or fire anyone), and Plaintiff did not regularly and customarily direct the work of two or more full-time workers.

45.     During Plaintiff's employment with Defendants, Plaintiff never evaluated other employees' performance for the purpose of recommending promotions or other changes in status.

46.     Plaintiff did not have the power or authority to discipline employees.

47.     Plaintiff did not write or assist with preparing any ECN policies.

48.     Additionally, Plaintiff did not perform any driving duties in interstate commerce, he was not subject to restrictions by the U.S. Secretary of Transportation, he was not licensed to operate a taxicab, and he did not drive for an employer engaged in the business of operating taxicabs.

49.     Therefore, Defendants misclassified Plaintiff as an exempt employee to avoid the overtime requirements mandated by the FLSA.

50.     In the course of employment with Defendants, Plaintiff worked the number of hours Defendants required of Plaintiff, but he was not paid time and one half for all hours worked in excess of 40 during a workweek.

51.     Defendants failed to keep time records for hours worked by Plaintiff.

52.     Defendants failed to pay Plaintiff based on the actual number of hours he worked and at the proper rate.

53.     During his employment with ECN, Plaintiff made several complaints to

Mr. McCormack and other members of senior management at ECN about, for example, not being properly compensated for his work and being on call all the time.

54.     On October 3, 2022, Plaintiff complained to Mr. McCormack and ECN's Chief Legal Officer, Mary Beth Koenig, about not being properly compensated for his work, including for being on call all the time, including nights and weekends.

55.     A few days later, on or about October 6, 2022, Mr. McCormack and Ms. Koenig advised Plaintiff that he was being terminated.

56.     Plaintiff was shocked by the termination.

57.     Plaintiff requested an explanation for his termination and was told that ECN was "downsizing," that Plaintiff's position was a "luxury" for Mr. Hudson, and that ECN was "cutting the position out."

58.     This explanation was clearly pretextual, particularly given various representations made to Plaintiff during his employment as well as his personal observations.

59.     During Plaintiff's employment with Defendants, he was never advised of any performance issues nor did he ever receive any write up or corrective action.

60.     Defendants' FLSA violations were willful and intentional.

61.     Plaintiff consents to the filing of this action and has retained the undersigned legal counsel to prosecute this action on his behalf and has agreed to pay a reasonable fee for legal services.

<u>COUNT I</u>
**OVERTIME VIOLATIONS AGAINST ECN UNDER THE FLSA**

62.     Plaintiff re-adopts every factual allegation as stated in paragraphs 1 through 61 above as though fully recited herein.

63.     Plaintiff performed primarily, if not exclusively, non-exempt duties and therefore,

NOT A CERTIFIED COPY

was entitled to be paid time and one half his regular rate for all hours worked in excess of 40 in each workweek.

64.    Plaintiff regularly worked in excess of 40 hours each workweek; however, ECN failed to pay the overtime wage required by the FLSA.

65.    The FLSA required that ECN pay Plaintiff time and one half his regular rate for all hours worked in excess of 40 hours per workweek.

66.    During Plaintiff's employment with Defendants, Plaintiff worked approximately 55 hours per week. During some weeks, Plaintiff worked in excess of 80 hours. However, Plaintiff was never paid time and one half his regular rate for all hours worked in excess of 40 hours each workweek.

67.    During the relevant period, ECN failed to comply with 29 U.S.C. §§ 201 – 219 and 29 C.F.R. §§ 516 *et seq.* in that Plaintiff performed services and worked for ECN in excess of 40 hours per workweek but no provision was made by ECN to properly pay Plaintiff at the rate of time and one half his regular rate for all hours worked in excess of 40 hours per workweek.

68.    During Plaintiff's employment with Defendants, Plaintiff worked approximately 55 hours per week. During some weeks, Plaintiff worked in excess of 80 hours. However, Plaintiff was never paid time and one half his regular rate for hours worked in excess of 40 hours each workweek.

69.    ECN attempted to evade the requirements of the FLSA by misclassifying Plaintiff as an exempt employee when in fact, he was a non-exempt employee under the FLSA.

70.    The failure to pay overtime compensation to Plaintiff was unlawful in that he was not exempt from the overtime provisions of the FLSA pursuant to the provisions of 29 U.S.C. § 213(a) and (b), in that he was not a bona fide executive, administrative, or professional employee,

nor was he subject to restrictions by the U.S. Secretary of Transportation, he was not licensed to operate a taxicab, and he did not drive for an employer engaged in the business of operating taxicabs.

71.     ECN knew or showed reckless disregard for the provisions of the FLSA concerning the payment of overtime wages and owe Plaintiff overtime wages.

72.     Plaintiff is entitled to recover liquidated damages under the FLSA as a result of ECN's intentional and willful violations for up to the three-year statute of limitations afforded by the FLSA.

73.     ECN is jointly and severally liable for the unpaid overtime as well as double the overtime amounts owed as liquidated damages under the FLSA as a result of intentional and willful violations of the FLSA.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against ECN:

A.     Adjudge and decree that ECN violated the FLSA and did so willfully, intentionally, and with reckless disregard;

B.     Award Plaintiff actual damages for unpaid overtime compensation;

C.     Award Plaintiff liquidated damages;

D.     Award Plaintiff the costs of this action, together with reasonable attorneys' fees;

E.     Award Plaintiff all recoverable interest; and

F.     Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>COUNT II</u>
**OVERTIME VIOLATIONS AGAINST MR. HUDSON UNDER THE FLSA**

74.     Plaintiff re-adopts every factual allegation as stated in paragraphs 1 through 61 above as though fully recited herein.

9

75.     During the relevant period, Mr. Hudson was the Chief Executive Officer of ECN.

76.     During the relevant period, Mr. Hudson:

  a)     Oversaw and had operational control over the day-to-day activities of Plaintiff;

  b)     Had supervisory authority over Plaintiff;

  c)     Had knowledge of the hours worked by Plaintiff;

  d)     Had knowledge of the work being performed by Plaintiff;

  e)     Had the authority to make financial and other employment-related decisions; and

  f)     Was partially or totally responsible for Plaintiff's compensation structure.

77.     Mr. Hudson was Plaintiff's employer, joint employer, or co-employer for purposes of the FLSA, as the term employer is defined by 29 U.S.C. § 203, during the relevant period.

78.     During his employment with Defendants, Plaintiff worked overtime hours for which he was not compensated at a rate of time-and-a-half his regular rate of pay as required by the FLSA.

79.     Plaintiff is owed unpaid overtime compensation pursuant to the FLSA for all hours worked in excess of 40 in a work week.

80.     During Plaintiff's employment with Defendants, Plaintiff worked approximately 55 hours per week. During some weeks, Plaintiff worked in excess of 80 hours. However, Plaintiff was never paid time and one half his regular rate for hours worked in excess of 40 hours each workweek.

81.     Mr. Hudson is jointly and severally liable for the unpaid overtime as well as double the overtime amounts owed as liquidated damages under the FLSA as a result of intentional and

willful violations of the FLSA.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against Mr. Hudson:

A.      Adjudge and decree that Mr. Hudson violated the FLSA and did so willfully, intentionally, and with reckless disregard;

B.      Award Plaintiff actual damages for unpaid overtime compensation;

C.      Award Plaintiff liquidated damages;

D.      Award Plaintiff the costs of this action, together with reasonable attorneys' fees;

E.      Award Plaintiff all recoverable interest; and

F.      Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>COUNT III</u>
**OVERTIME VIOLATIONS AGAINST MR. MCCORMACK UNDER THE FLSA**

82.      Plaintiff re-adopts every factual allegation as stated in paragraphs 1 through 61 above as though fully recited herein.

83.      During the relevant period, Mr. McCormack was the Chief Risk Officer of ECN.

84.      During the relevant period, Mr. McCormack:

a)      Oversaw and had operational control over the day-to-day activities of Plaintiff;

b)      Had supervisory authority over Plaintiff;

c)      Had knowledge of the hours worked by Plaintiff;

d)      Had knowledge of the work being performed by Plaintiff;

e)      Had the authority to make financial and other employment-related decisions; and

f)      Was partially or totally responsible for Plaintiff's compensation structure.

11

85.     Mr. McCormack was Plaintiff's employer, joint employer, or co-employer for purposes of the FLSA, as the term employer is defined by 29 U.S.C. § 203, during the relevant period.

86.     During his employment with Defendants, Plaintiff worked overtime hours for which he was not compensated at a rate of time-and-a-half his regular rate of pay as required by the FLSA.

87.     Plaintiff is owed unpaid overtime compensation pursuant to the FLSA for all hours worked in excess of 40 in a work week.

88.     During Plaintiff's employment with Defendants, Plaintiff worked approximately 55 hours per week. During some weeks, Plaintiff worked in excess of 80 hours. However, Plaintiff was never paid time and one half his regular rate for hours worked in excess of 40 hours each workweek

89.     Mr. McCormack is jointly and severally liable for the unpaid overtime as well as double the overtime amounts owed as liquidated damages under the FLSA as a result of intentional and willful violations of the FLSA.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against Mr. McCormack:

A.      Adjudge and decree that Mr. McCormack violated the FLSA and did so willfully, intentionally, and with reckless disregard;

B.      Award Plaintiff actual damages for unpaid overtime compensation;

C.      Award Plaintiff liquidated damages;

D.      Award Plaintiff the costs of this action, together with reasonable attorneys' fees;

E.      Award Plaintiff all recoverable interest; and

F.     Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>COUNT IV</u>
**RETALIATION AGAINST ECN UNDER THE FLSA**

90.     Plaintiff re-adopts every factual allegation as stated in paragraphs 1 through 61 above as though fully recited herein.

91.     During his employment with ECN, Plaintiff made several complaints to Mr. McCormack and other members of senior management at ECN about, for example, not being properly compensated for his work and on call time.

92.     On October 3, 2022, Plaintiff complained to Mr. McCormack and ECN's Chief Legal Officer, Mary Beth Koenig, about not being properly compensated for his work, including for being on call all the time, including nights and weekends.

93.     A few days later, on or about October 6, 2022, ECN, through Mr. McCormack and ECN's Chief Legal Officer, terminated Plaintiff's employment with ECN.

94.     Plaintiff was terminated because of his protected activity.

95.     Because of the unlawful adverse employment action, Plaintiff is entitled to damages, including, back pay, liquidated damages, and compensatory damages.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against ECN:

A.     Adjudge and decree that ECN violated the FLSA and did so willfully, intentionally, and with reckless disregard;

96.     Award Plaintiff back pay and any other compensation to which he would have been entitled under the Employment Agreement had he not been unlawfully terminated;

B.     Award Plaintiff liquidated damages;

C.     Award Plaintiff compensatory damages;

13

D.      Award Plaintiff the costs of this action, together with reasonable attorneys' fees;

E.      Award Plaintiff all recoverable interest; and

F.      Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

**COUNT V**
**BREACH OF CONTRACT AGAINST ECN**

97.     Plaintiff re-adopts every factual allegation as stated in paragraphs 1 through 61 above as though fully recited herein.

98.     On or about January 6, 2022, Plaintiff and ECN entered into an Employment Agreement, for which sufficient consideration was provided. *See* Ex. 1.

99.     ECN breached the Employment Agreement by not paying Plaintiff all monies owed under the Employment Agreement.

100.    For example, ECN has not paid Plaintiff his full salary for his final two weeks of employment with ECN or his full salary on the last paycheck Plaintiff received from ECN, to which Plaintiff is entitled under the Employment Agreement.

101.    As a direct and proximate result of ECN's breaches of its contractual obligations to Plaintiff, Plaintiff has suffered damages.

102.    In addition, as this is an action to recover unpaid wages, Plaintiff is entitled to recover from ECN his reasonable attorneys' fees pursuant to Fla. Stat. § 448.08.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against ECN:

A.      Enter judgment in favor of Plaintiff;

B.      Award Plaintiff damages for breach of contract, including unpaid wages;

C.      Award Plaintiff reasonable attorneys' fees and costs pursuant to Fla. Stat. § 448.08;

D.      Award Plaintiff all recoverable interest; and

14

E.  Grant Plaintiff such additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all issues so triable.

Dated: December 21, 2022

Respectfully submitted,

**BT LAW GROUP, PLLC**
3050 Biscayne Blvd., Suite 205
Miami, Florida 33137
Tel: (305) 507-8506

By: s/ Anisley Tarragona
**ANISLEY TARRAGONA, ESQ.**
Florida Bar No. 51626
anisley@btattorneys.com
**JASON D. BERKOWITZ, ESQ.**
Florida Bar No. 0055414
jason@btattorneys.com
Attorneys for Plaintiff

# EXHIBIT 1



**EMPLOYMENT AGREEMENT**

This Employment Agreement is made as of the date signed below (this "**Agreement**") by and between ECN (US) Holdings Corp. (the "**Corporation**") and **Christopher McWilliams** (hereinafter referred to as the "**Employee**").

As a condition of employment and in consideration of the Corporation hiring, training, educating, and supervising the Employee, in consideration of providing the Employee access to the Corporation's Confidential Information (as defined below), in consideration of the covenants, representations, and agreements set forth herein, and/or in exchange for other good and valuable consideration, the adequacy, sufficiency, and receipt of which is hereby acknowledged, and intending to be legally bound, the Corporation and the Employee covenant and agree as follows.

1. **Employment, Job Description, and Duties.**

The Corporation hereby agrees to employ the Employee, commencing January 10, 2022 (the "**Commencement Date**") as a Secured Driver and the Employee hereby accepts employment with the Corporation subject to the terms, conditions, and provisions as set forth herein. Employee is subject to a 120 probationary period.

<u>**Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine or otherwise modify the "at-will" status of the employment relationship between the Corporation and the Employee, pursuant to which either the Corporation or the Employee may terminate the employment relationship at any time, with or without cause, and with or without notice**</u>.

The Employee's initial job description, duties, and the responsibilities shall include, but shall not be limited to, secured driving services, security, and other tasks as may be assigned by the Chief Risk Officer ("**CRO**") and/or the Chief Executive Officer ("**CEO**") of the Corporation. The Employee shall also be responsible for performance of such other duties and accepts such other responsibilities and agrees to fulfill such other positions as may be prescribed, substituted, modified, or amended by the Corporation from time to time, solely at its discretion. The Employee shall devote the Employee's full time, attention, energies and best efforts to the business of the Corporation and shall not during the Employee's employment be engaged in any other business activity in any capacity, for any entity, whether or not such business activity is pursued for gain or pecuniary advantage, unless the Employee first submits a written request for such activity and receives prior written approval from the Corporation.

2. **Compensation, Benefits, and Perquisites.**

The Corporation agrees to provide the Employee with the following compensation, benefits, and perquisites for all services rendered under this Agreement:

    a. <u>Annual Base Salary</u>:    The Corporation shall pay the Employee a base salary at the annual rate of $92,500 (the "**Base Salary**") subject to changes and modifications at the sole discretion of the Corporation. The Base Salary shall be inclusive of all applicable income, social security and other taxes and deductions that are required by law to be withheld by the Corporation, or requested to be withheld by the Employee, and shall be withheld and paid in accordance with the Corporation's normal payroll policies and procedures in effect from time to time.

    b. <u>Annual Bonus</u>:    The Employee will be eligible to receive an annual discretionary bonus. The Employee's annual target bonus opportunity shall be up to 15% of Base Salary ("**Bonus Opportunity**"), based on the achievement of individual and corporate/business



performance objectives established from time to time by the CRO, the CEO of the Corporation and/or the Board. This bonus is not guaranteed, is paid only at the discretion of the Corporation, and the Corporation reserves the right to modify, suspend or discontinue such bonus at any time without any obligation to replace the bonus or to otherwise compensate the Employee in respect thereof. During the first calendar year of employment, any bonus eligibility will be on a prorated basis. In order to receive the annual bonus the Employee must be actively employed by the Corporation at the time the bonus is paid.

(c)   <u>Performance Share Units (PSUs)</u>:     Employee is eligible to participate in the Corporation's Long-Term-Incentive (LTI) Program. The first long-term incentive grant for which the Employee is eligible will occur following the completion of the 120 probationary period, at which time the Employee will be eligible to be granted Performance Share Units ("**PSUs**") of ECN Capital Corp., the ultimate parent of the Corporation ("**ECN Capital**") in accordance with ECN Capital's Share Unit Plan (the "**Unit Plan**"), provided, however, that the Employee is actively employed by the Corporation on, and has not received or given notice of termination or resignation prior to that date. Award amounts are not guaranteed, are reviewed on an annual basis and are subject to change at any time at the discretion of ECN Capital. Any such PSUs granted will vest at a rate of one-fourth per annum commencing on December 31 of the calendar year in which the PSUs are granted. The number of PSUs granted will be based on the 10 Day Volume Weighted Average Price as required under the Unit Plan.

(d)   <u>Other Benefits:</u> The Employee shall be eligible to participate in all employee benefit, insurance, policies and arrangements that the Corporation makes available to similarly situated employees (including life, health and disability plans), to the extent that the Employee is otherwise eligible and is qualified to participate in any such plan, policy or arrangement under the generally applicable provisions thereof in effect from time to time. Nothing herein shall be deemed to prohibit the Corporation (or any affiliate of the Corporation that sponsors any such plan, policy or arrangement) from amending or terminating any such plan, policy or arrangement in its sole and absolute discretion. The terms of each such plan, policy and arrangement shall govern the Employee's rights and obligations thereunder during the Employee's employment and upon the termination thereof.

(e)   <u>Paid Time-Off:</u> The Employee shall be entitled to two (2) weeks paid time-off per calendar year (prorated for partial years), in accordance with the Corporation's policies as may exist from time to time.

(f)   <u>Business Expenses:</u> The Employee shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business and travel expenses incurred by the Employee in connection with the performance of the Employee's duties hereunder. All payments under Section 2(f) will be made in accordance with expense reimbursement policies and procedures established by the Corporation from time to time and subject to receipt by the Corporation of appropriate documentation but shall in no event be paid later than the end of the calendar year following the calendar year in which such business expense is incurred by the Employee. Any reimbursement in one calendar year shall not affect the amount that may be reimbursed in any other calendar year and a reimbursement (or right thereto) may not be exchanged or liquidated for another benefit or payment.

(g)   <u>Performance Review:</u> The Chief Risk Officer and/or the Chief Executive Officer shall conduct an annual review of the Employee's performance, and use the review to determine the Employee's annual discretionary bonus, if any, for the previous year and base salary for the following year.

(h)   <u>Vehicle</u>: The Corporation shall provide the vehicle(s) to be used by the Employee in connection with secured driving services. Such vehicle(s) shall be in the possession of, and maintained (to such standards satisfactory to the Chief Risk Officer and at the Corporation's cost) by, the Employee during his employment, but shall remain the property of the Corporation at all times.

 **ECN** CAPITAL

3. __Confidential Information.__

**Confidential Information.** Confidential Information means information, whether or not originated by the Employee, whether oral or written, concerning the Business (as defined below) or affairs of the Corporation, their clients, and vendors, and is confidential or proprietary to the Corporation, as well as their respective clients and vendors. Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing or designated or marked as confidential):

a. work product resulting from or related to work or projects performed or to be performed by the Corporation;

b. information relating to any discoveries, know how, inventions, designs, works of authorship, ideas, contributions, developments, processes, compositions, techniques or any improvements thereof, and legally recognized proprietary rights prior to any public disclosure thereof, including but not limited to information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

c. internal Corporation personnel and financial information, vendor names and other vendor information, purchasing and internal cost information, internal services, and operational manuals;

d. marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques, methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Corporation that have been or are being discussed, customer names, and customer information;

e. contracts and their contents, client services, data provided by clients, and the type, quantity, and specifications of products and services purchased, leased, licensed, or received by clients of the Corporation and ECN Capital;

f. all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, and required for the exercise of, any of the foregoing, however arising, pursuant to the laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (i) trademarks, service marks, trade names, brand names, logos, trade dress, design rights, and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (ii) internet domain names, whether or not trademarked, registered in any top-level domain by any authorized private registrar or governmental entity, web addresses, web pages, websites, and related content, accounts with Twitter, Facebook, Instagram, SnapChat, and other social media companies and the content found thereon and related thereto, and URLs; (iii) works of authorship, expressions, designs, and design registrations, whether or not copyrightable, including copyrights, author, performer, moral, and neighboring rights and other similar rights of attribution, and all registrations, applications for registration and renewals of such copyrights; (iv) inventions, discoveries, trade secrets, business, and technical information and know-how, databases, data collections, and other confidential and proprietary information and all rights therein; (v) patents (including all preliminary approvals, submissions, reissues, divisional, provisional, continuations, and continuations-in-part, re-examinations, renewals, substitutions, and extensions thereof), patent applications, and other patent rights, and any other common law and/or governmental entity-issued *indicia* of invention ownership (including inventor's certificates, petty patents, and patent utility models); (vi) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases, and other related specifications and documentation; and (vii) customer or potential customer lists; and

g. all Confidential Information of the Corporation that becomes known to the Employee as a result of his employment with the Corporation, which the Employee acting reasonably, believes is Confidential Information of the Corporation or that the Corporation takes measures to protect, provided that the Employee is aware or should be aware of such measures.

**Confidential Information does not include:**

a. the general skills, general knowledge and experience gained during the Employee's employment;

b. information publicly known without breach of this Agreement by any person; or



c.    information, the public disclosure of which is required to be made by Law and only to the extent of the requirement, provided that before disclosure is made, notice of the requirement is provided to the Corporation where it is within the Employee's control to provide such notice, and to the extent possible in the circumstances, the Corporation is afforded an opportunity to dispute the requirement.

Nothing in or about this Agreement prohibits the Employee from: (i) filing and, as provided for under Section 21F of the Securities Exchange Act of 1934, maintaining the confidentiality of a claim with the Securities and Exchange Commission (the "SEC"); (ii) providing Confidential Information (as defined herein) to the SEC, or providing the SEC with information that would otherwise violate Section 9.1, to the extent permitted by Section 21F of the Securities Exchange Act of 1934; (iii) cooperating, participating or assisting in an SEC investigation or proceeding without notifying the Corporation; or (iv) receiving a monetary award as set forth in Section 21F of the Securities Exchange Act of 1934.

Furthermore, the Employee is advised that he shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of any Confidential Information (as defined herein) that constitutes a trade secret to which the Defend Trade Secrets Act (18 U.S.C. Section 1833(b)) applies that is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

4.    **Restrictive Covenants – Exhibit A.**

a.    Non-Solicitation and No-Hire. During the Restricted Period (as defined in Exhibit A hereto), Employee shall not, directly or indirectly, without the prior written consent of the Corporation, (i) induce or solicit any employee or independent contractor of the Corporation to leave its employ, or interfere with the relationship between the Corporation with any of its employees or independent contractors, (ii) hire or otherwise retain for services any employee or independent contractor of the Corporation, or any former employee or independent contractor of the Corporation within the six (6)-month period immediately following the date on which such person ceased to be an employee or independent contractor thereof, or (iii) induce or solicit any customer or client to cease doing business with the Corporation or interfere with the relationship between any such customer or client, on the one hand, and the Corporation, on the other hand.

b.    Nondisclosure. From the Effective Date (as defined in Exhibit A hereto) and until the expiration of the Restricted Period, Employee shall treat and hold as confidential all information, in any form, whether oral or written, concerning the business of the Corporation (the "Confidential Information") and, except as otherwise expressly permitted by this Agreement or as necessary in connection with disputes over the terms of this Agreement or as is necessary for Employee to perform or comply with his duties as a key Corporation employee: (i) refrain from using any of the Confidential Information, and (ii) upon the request of the Corporation, deliver promptly to the Corporation or destroy all tangible embodiments (including all copies) of the Confidential Information which is in Employee's possession or otherwise under his control; provided that Employee may disclose Confidential Information to his agents and representatives (including attorneys, accountants and financial advisors) to the extent such agents and representatives are advised of the confidential nature of such Confidential Information and directed to keep confidential such Confirmation Information. In the event that Employee reasonably believes, after consultation with counsel, that he is required by law or order or directive of a governmental or regulatory agency (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Employee shall notify the Corporation promptly of the request or requirement so that the Corporation (or an Affiliate) may attempt, at its expense, to obtain an appropriate protective order or waive compliance with the provisions of this Section. Employee shall reasonably cooperate with the Corporation (or such Affiliate), at the Corporation's expense, in attempting to obtain such order or assurance. If, in the absence of a protective order or the receipt of a waiver hereunder, Employee is, on the advice of



counsel, required to disclose any Confidential Information to any tribunal, Employee may disclose the Confidential Information to such tribunal; provided that Employee shall, at the request and expense of the Corporation, request an order or other assurance specified by the Corporation that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed. Notwithstanding the foregoing, for purposes of this Agreement, Confidential Information shall not include information which is or becomes generally available to the public other than as a result of a disclosure by Employee in violation of this Agreement.

c.   Employee acknowledges and agrees that the promises and restrictive covenants that he is providing in this Agreement are reasonable with respect to time, geographical area, line of business, and scope (all, within the meaning of Fla. Stat. §542.335, et seq.) and are necessary for the protection of the legitimate business interests of the Corporation and the business and assets of the Corporation (including the business relationships, trade secrets and goodwill of the Corporation), and that such limitations would not impose any undue burden upon Employee. In the event that any such period, geographical area or scope limitation is deemed to be invalid, prohibited or unenforceable by a court of competent jurisdiction, the Corporation and Employee agree to the reduction of any or all of said period, geographical area or scope limitation to such a period, geographical area or scope as said court shall deem reasonable or enforceable under the circumstances. If such partial enforcement is not possible in such jurisdiction, the provision shall be deemed severed as to such jurisdiction and the remaining provisions of this Agreement shall remain in full force and effect.

d.   Employee agrees that the consideration received by Employee in connection herewith, and other good and valuable consideration received by her from the Corporation, is sufficient to support the agreement by Employee to enter into this Agreement.

e.   In addition, because the protection of the Confidential Information and goodwill and the Corporation's other legitimate business interests requires that Employee comply with the covenants in this Agreement for the full Restricted Period, Employee agrees that the Restricted Period will be extended for a period of time equal to the time period that Employee breached any of the covenants and for the period equal to the length of the court proceedings necessary to stop any such violation, such that Employee is ultimately foreclosed from engaging in the restricted activities for a time period equal to the full applicable Restricted Period.

5.   **Nondisclosure of Proprietary Information.**

a.   The Employee shall, in perpetuity, maintain in confidence and shall not directly, indirectly or otherwise, use, disseminate, disclose or publish, or use for the Employee's benefit or the benefit of any person, firm, corporation or other entity any confidential or proprietary information or trade secrets of or relating to the Corporation (including, without limitation, intellectual property in the form of patents, trademarks, trade names, designs and copyrights and applications therefore, ideas, inventions, works, discoveries, improvements, information, documents, formulae, practices, processes, methods, developments, source code, modifications, technology, techniques, data, programs, other know-how or materials, owned, developed or possessed by the Corporation, whether in tangible or intangible form, information with respect to the Corporation's operations, processes, products, inventions, business practices, finances, principals, vendors, suppliers, customers, potential customers, marketing methods, costs, prices, contractual relationships, regulatory status, prospects and compensation paid to employees or other terms of employment), or deliver to any person, firm, corporation or other entity any document, record, notebook, computer program or similar repository of or containing any such confidential or proprietary information or trade secrets. The parties hereby stipulate and agree that as between them the foregoing matters are important, material and confidential proprietary information and trade secrets and affect the successful conduct of the businesses of the Corporation (and any successor or assignee of the Corporation).

 ECN CAPITAL

b.   Upon termination of the Employee's employment with the Corporation for any reason, the Employee will promptly deliver to the Corporation all correspondence, drawings, manuals, letters, notes, notebooks, reports, programs, plans, proposals, financial documents, or any other documents concerning the Corporation's customers, business plans, marketing strategies, products or processes.

c.   The Employee may respond to a lawful and valid subpoena or other legal process but shall give the Corporation the earliest possible notice thereof, and shall, as much in advance of the return date as possible, make available to the Corporation and its counsel the documents and other information sought and shall assist such counsel at the Corporation's expense in resisting or otherwise responding to such process.

d.   Nothing in this Agreement shall prohibit the Employee from (i) disclosing information and documents when required by law, subpoena or court order (subject to the requirements of Section 4(c)), (ii) disclosing information and documents to the Employee's attorney or tax adviser for the purpose of securing legal or tax advice, (iii) disclosing the post-employment restrictions in this Agreement to any potential new employer, (iv) retaining, at any time, the Employee's personal correspondence, personal rolodex or electronic contacts and documents related to the Employee's own personal benefits, entitlements and obligations, or (v) disclosing or retaining information that is already generally available to the public through no fault of the Employee or otherwise was part of the public domain at the time of disclosure.

6.   **Inventions.**

All rights to discoveries, inventions, improvements and innovations (including all data and records pertaining thereto) related to the Corporation, whether or not patentable, copyrightable, registerable as a trademark, or reduced to writing, that the Employee may discover, invent or originate during the employment, either alone or with others and whether or not during working hours or by the use of the facilities of the Corporation ("**Inventions**"), shall be the exclusive property of the Corporation. The Employee shall promptly disclose all Inventions to the Corporation, shall execute at the request of the Corporation any assignments or other documents the Corporation may deem reasonably necessary to protect or perfect its rights therein, and shall assist the Corporation, upon reasonable request and at the Corporation's expense, in obtaining, defending and enforcing the Corporation's rights therein. The Employee hereby appoints the Corporation as the Employee's attorney-in-fact to execute on the Employee's behalf any assignments or other documents reasonably deemed necessary by the Corporation to protect or perfect its rights to any Inventions.

7.   **Injunctive Relief.**

It is recognized and acknowledged by the Employee that a breach of the covenants contained in Section 3, 4 or 5 will cause irreparable damage to the Corporation and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate. Accordingly, the Employee agrees that in the event of a breach of any of the covenants contained in Section 3, 4 or 5, in addition to any other remedy which may be available at law or in equity, the Corporation will be entitled to specific performance and injunctive relief as appropriate. The Employee also agrees that the Corporation shall not be bound by Section 16 of this Agreement with respect to a breach of any covenants contained in Section 3, 4, or 5.

8.   **Termination of Employment – After the expiration of the Probationary Period.**

a.   In General. If the Employee's employment is terminated for any reason, (i) the Corporation shall pay to the Employee (or the Employee's estate or beneficiary, as applicable) in a lump sum within thirty (30) days following such termination, or at such other time prescribed by any applicable plan, (A) any salary payable to the Employee pursuant to this Agreement, accrued up to and



including the date on which the Employee's employment is terminated (the "Termination Date"), (B) reimbursement for any unreimbursed business expenses incurred by the Employee prior to the Termination Date pursuant to Section 2(f), to the extent such amounts qualify for reimbursement, and (C) payment for accrued but unused paid time off as of the Termination Date, in accordance with the Corporation's paid time off policy ((A)-(C) are referred to herein collectively as the "Accrued Amounts"), and (ii) the Employee (or the Employee's estate or beneficiary, as applicable) shall receive any vested benefits that the Employee (or the Employee's estate or beneficiary, as applicable) may be entitled to receive under any disability or insurance plan or other applicable employee benefit plan maintained by the Corporation or any of its affiliates.

b.  <u>Involuntary Termination without Cause.</u> If the Employee's employment is involuntarily terminated by the Corporation without Cause (as herein defined) after the probationary period has expired, in addition to the Accrued Amounts, the Employee shall be entitled to receive as severance (subject to <u>Section 8(c)</u>) an amount equal to four (4) months' of Base Salary, at the rate in effect immediately prior to the Termination Date (the "Severance Amount"), which shall be paid in cash and in full on the sixty-first (61st) day following the Termination Date

c.  Notwithstanding the terms of this Agreement, the receipt of the Severance Amount pursuant to this Agreement is subject to the Employee signing and not revoking the Corporation's then-standard release of claims (the "Release"), which must become effective and irrevocable no later than the sixtieth (60th) day following the Termination Date (the "Release Deadline"). If the Release does not become effective and irrevocable by the Release Deadline, the Employee shall forfeit any right to the Severance Amount under this Agreement.

d.  <u>Definition of Cause.</u> For purposes of this Agreement, "Cause" means any one or more of the following events, incidents, conditions or circumstances:

(i)  Any material failure or refusal by the Employee to perform or otherwise discharge the Employee's duties and responsibilities, as reasonably contemplated by this Agreement, as may hereafter be amended and is then in effect (other than any such failure resulting from incapacity due to a clinically-diagnosed physical or mental condition);

(ii)  Any violation by the Employee of the <u>Sections 3, 4 or 5</u> of this Agreement;

(iii)  Willful engagement by the Employee in dishonest, illegal or unlawful conduct, which is materially injurious to the Corporation, as determined by the Board of Managers of the Corporation (the "Board");

(iv)  The Employee's conviction of, or plea of guilty or nolo contendere to, any crime that constitutes a felony (whether under federal or state law) or any crime that constitutes a misdemeanor but involves moral turpitude, if such felony or other crime is work/service-related, materially impairs the Employee's ability to perform services for the Corporation, or is reasonably believed to likely result in material harm to the reputation or financial condition of the Corporation; and/or

(v)  The Employee's willful violation of a material policy of the Corporation, subject only to the Employee's right to cure said violation within five (5) days following the Employee being notified by the Board that such a violation has occurred.

For purposes of determining whether Cause exists, no act or failure to act on the part of the Employee shall be considered "willful" unless done, or omitted to be done, by the Employee in bad faith or without reasonable belief on the part of the Employee that such action or omission was in the best interests of the Corporation.

Termination of the Employee's service relationship with the Corporation shall not be deemed to be for Cause unless and until the Corporation delivers to the Employee a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the Board (after reasonable written notice is provided to the Employee and the Employee is given an opportunity, together with counsel, to be heard by the Board), finding that the Employee has engaged in the above conduct (as applicable).



9.  **Section 409A.**

The Corporation intends that all payments and benefits provided under this Agreement are exempt from, or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and other interpretative guidance promulgated thereunder ("Section 409A") so that none of the payments or benefits will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. No severance shall be paid until the Employee has a "separation from service" within the meaning of Section 409A. If the Employee is a "specified employee" within the meaning of Section 409A on the date of the Employee's separation from service and if the Severance Amount would be considered "deferred compensation" under Section 409A, the payment of the Severance Amount shall not be paid on any date prior to the first business day after the date that is six months following the Termination Date. Notwithstanding the foregoing, the delay period pursuant to this six-month delay requirement shall expire earlier in the event of the Employee's death prior to the end of the six-month period. The Corporation reserves the right to amend this Agreement as it deems necessary or advisable, in its sole discretion and without the consent of the Employee, to comply with Section 409A or to otherwise avoid income recognition under Section 409A prior to the actual payment of any benefits or imposition of any additional tax. Each payment, installment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of U.S. Treasury Regulation Section 1.409A-2(b)(2).

10. **Assignment and Successors.**

The Corporation may assign its rights and obligations under this Agreement to any affiliate and any successor to all or substantially all of the business or the assets of the Corporation (by merger or otherwise) and may assign or encumber this Agreement and its rights hereunder as security for indebtedness of the Corporation and its affiliates. This Agreement shall be binding upon and inure to the benefit of the Corporation, the Employee and their respective successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributees, devisees, and legatees, as applicable. None of the Employee's rights or obligations may be assigned or transferred by the Employee, other than the Employee's rights to payments hereunder, which may be transferred only by will or operation of law. Notwithstanding the foregoing, the Employee shall be entitled, to the extent permitted under applicable law, to select and change a beneficiary or beneficiaries to receive compensation hereunder following the Employee's death by giving written notice thereof to the Corporation.

11. **Governing Law.**

This Agreement shall be governed, construed, interpreted and enforced in accordance with its express terms and otherwise in accordance with the substantive laws of the State of Florida, without reference to principles of conflict of laws of that jurisdiction or any other jurisdiction. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the state of Florida, county of Palm Beach. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

12. **Notices.**

Any notice, request, claim, demand, document and other communication hereunder to any party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by facsimile or certified or registered mail, postage prepaid, as follows:

a.  If to the Corporation:
    Mary Beth Koenig
    Chief Legal Counsel, ECN Capital Corp
    777 South Flagler Drive 800E
    West Palm Beach, FL 33401

b.  If to the Employee:
    Christopher McWilliams



2344 SW Savage Blvd
Port St. Lucie, FL 34953

Or at any other address as any party shall have specified by notice in writing to the other party.

13. **Counterparts.**

This Agreement may be executed in separate counterparts (including by means of delivery of facsimile machine or other electronic transmission (including .pdf) of a signature page), each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

14. **Entire Agreement.**

The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the employment of the Employee by the Corporation and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties further intend that this Agreement shall constitute the complete and exclusive statement of their terms relating to the subject matter hereof and shall supersede and replace all prior agreements and understandings between the parties relating to the subject matter hereof. No extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding to vary the terms of this Agreement.

15. **Amendments; Waivers.**

Except as provided by Section 9, this Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by the Employee and a duly authorized officer of the Corporation. By an instrument in writing similarly executed, the Employee or a duly authorized officer of the Corporation may waive compliance by the other party or parties with any specifically identified provision of this Agreement that such other party was or is obligated to comply with or perform; provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity. Except as otherwise set forth in this Agreement, the respective rights and obligations of the parties under this Agreement shall survive any termination of the Employee's employment.

16. **No Conflict.**

The Employee represents and warrants that the Employee is not subject to any agreement or other obligation or understanding that would prevent the Employee from entering into this Agreement and performing the Employee's duties hereunder, and that in the course of performing the Employee's duties hereunder the Employee shall not in any manner use protected confidential or proprietary information from any previous employer or other source. The Corporation and its affiliates shall be indemnified and held harmless by the Employee from and against any and all costs, losses, damages, liabilities, expenses, judgments, fines, settlements and other amounts arising from a breach of this representation.

17. **Construction.**

This Agreement shall be deemed drafted equally by both the parties. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any party shall not apply. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the



context clearly indicates to the contrary. Also, unless the context clearly indicates to the contrary: (a) the plural includes the singular and the singular includes the plural; (b) "and" and "or"

are each used both conjunctively and disjunctively; (c) "any," "all", "each," or "every" means "any and all," and "each and every", (d) "includes" and "including" are each "without limitation"; (e) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (f) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to may require.

18. **Enforcement.**

      If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

19. **Withholding.**

      The Corporation shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local or foreign withholding or other taxes or deductions which the Corporation is required to withhold. The Corporation shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholder shall arise.

20. **FLSA Exempt Employee**.

      The Employee acknowledges that the Employee is "exempt" from the FLSA requirements that an employee be entitled to overtime pay for services performed over the applicable FLSA overtime threshold as determined under the FLSA overtime rules.

21. **Acknowledgement.**

      The Employee acknowledges that the Employee has read and understands this Agreement, is fully aware of its legal effect, has not acted in reliance upon any representation or promises made by the Corporation other than those contained in writing herein, and has entered into this Agreement freely based on the Employee's own judgment.

*(Remainder of page intentionally left blank; signature page follows)*

**ECN** CAPITAL

IN WITNESS WHEREOF, the parties have executed this Agreement on this ___6TH___ day of January, 2022.

| | |
|---|---|
| **SIGNED, SEALED AND DELIVERED** | ) |
| in the presence of: | ) |
| | ) |
| | ) |

_____       *C. McWilliams*
Witness as to the signature of the Employee        Christopher McWilliams

ECN (US) Holdings Corp.

Per: _____
          Mary Beth Koenig
          Chief Legal Officer

NOT A CERTIFIED COPY